Howey, Judge,
delivered the opinion of the court:
This is one of a group of cases arising under the Indian depredation act of March 3, 1891 (26 Stats., 851). Some confusion has arisen on account of conflict in the testimony *64 relating to the occurrences and because the defenses are different where the depredations occurred at different times. The decision now to be made in this case will govern the question of the defendants’ liability in all other cases where motions for new trial are pending if it appears that the depredations were committed before the ratification of the agreement between the Sioux tribe and the United States.
The petition, drawn fifteen years ago and at a time when the claimant’s recollection would naturally be fresh as to the events in question, shows that the depredation was committed on February 15, 1877, by Sioux Indians. The court has not treated this allegation pertaining to date as conclusive, especially as the claimant knew nothing of the loss of his own knowledge and does not appear to have been in that part of the country at the time of the depredation. But subsequent to the filing of the petition it was sought by him to change the allegation as to the date of his loss, the effect of which, if the last date given be accepted, excludes the defense interposed to the original petition. Under these circumstances the court has proceeded with care to determine the exact date as near as may be. Manifestly the proof relating to the matter of date set forth in the amended petition ought to be clear and convincing as against that originally alleged. There is no room to doubt but that the loss occurred prior to the ratification of the agreement between the defendants, and consequently the date of the loss set forth in the amended petition as subsequent to February 28, 1877, can not be accepted. Out of these facts is presented the question of law necessary to be decided.
Defendants entered into a treaty (which had never been superseded except as shown in the contract hereinafter stated) by which it was agreed on the part of the United States that no persons except those designated by the treaty should enter upon the reservation or be permitted to pass over, settle upon, or reside in the territory where this property was taken. It is not contended that the claimant had any leave or license from the Indians, or that he had any right to occupy Indian lands or to pasture his horses thereupon except such right as may have been enjoyed by all other *65 citizens of the United States. The territory thus reserved to the Sioux was afterwards by them ceded, in part, to the United States, and it was on this territory that the depredations were committed. The agreement by which the reservation was so diminished was negotiated in the autumn of 1876. It was not a treaty, but a contract between the United States and the Sioux tribes or nation of Indians which required the assent of Congress and the Executive to make it binding. This approval was given by an act of Congress 'approved February 28, 1877. Under these conditions liability did not ordinarily arise under the act of March 8,1891, and previous acts of Congress for depredations committed by individuals among the Sioux upon the property of white intruders so as to charge the annuities of the tribe. (Bush v. United States, 29 C. Cls. R., 144; Welch v. United States, 32 C. Cls. R., 106.)
But it is earnestly contended that the circumstances surrounding the opening up of the Black Hills for settlement were the result of government exploration in consequence of the discovery of gold there, and that there was immediately such a volume of immigration to the country that a great majority of the Sioux Indians went on the warpath, in consequence of which the military forces were sent to quell the disturbances and that all military opposition to settlement of the Black Hills was withdrawn; that more than 10,000 settlers had entered the country before the contract disclosed by the findings, and that a regular civil government had been established by permission of the United States; that the military commanders advised settlers as to the measures they should take to protect themselves and maintain their settlements, from which it is argued that the presence of the claimant and his agents in the country was lawful, and that under these conditions the approval of the agreement to cede the land where this depredation was committed related back to the date when the agreement was made. As this agreement was entered into the year preceding the depredation, it is urged that the United States acquired title contemporaneously with the occupation of the country by its military forces and by reason of the circumstances set forth, and un *66 der the general rule of international law concerning the cession of the land that, as between the parties, a treaty operates from the date of its signature and should be applied to this case so as to make the presence of settlers in the country lawful from the date of the agreement.
“It is undoubtedly true, as a principle of international law,” said Wheaton and the Supreme Court, “ that, as respects the rights of either government under it, a treaty is considered as conclusive and binding from the date of its signature. In this regard the exchange of ratifications has a retroactive effect, confirming the treaty from its date.” (Haver v. Yaker, 9 Wall., 34.) But a different rule prevails where the treaty operates on individual rights. The principle of relation does not apply to rights of this character until there is an exchange of ratifications. (Arredondo's case, 6 Pet., 749.) If it were intended to give retrospective operation to this agreement it must not be supposed that words would have been used that expressed the contrary intention. It would be a singular kind of a contract which provided for mutual concessions that one party should be held to its obligation pending acceptance while the other was not. The agreement had no validity until formally approved by the political departments of this Government, and in this respect the agreement is governed by the same principle applicable to the rights of the individual citizen under treaty. Possession of the country by the military forces pending the treaty no more transferred title to the land than it did to divest the right of exclusive occupation by the Sioux.
The right to recovery and the reasons advanced in support of the right come at last and really rest upon the proposition involved in the general misconduct of the Sioux, who, first precipitating a state of war, had been subdued in part, but were yet committing depredations by those members of the tribe who still remained hostile. Xf the conditions as to war existed, recovery for that reason alone is prohibited. If peace prevailed, the Sioux, it is true, had no license to rob the settlers or engage in the destruction of their property. But the action is not in trespass. The annuities of the whole tribe are chargeable for the acts of the individual members *67 only' upon tbe conditions prescribed by law, and tbe United States assumed to pay only as guarantors if the Sioux were primarily liable. Tbe circumstances set forth in the petition, if true in every particular, do not create liability, because tbe claimant was unlawfully on tbe reservation.
Petition dismissed.